**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DENNIS CHIAMULERA, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br> v.<br><br>TLA ENTERTAINMENT GROUP, INC.,<br><br>      Defendant. | Civil Action No.: 7:19-cv-09512<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Dennis Chiamulera ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1. Defendant TLA Entertainment Group, Inc. ("TLA") is a video service provider of adult films, specializing in gay and lesbian cinema. Despite the sensitive nature of its videos, TLA sold, rented, exchanged, and/or otherwise disclosed personal information about Plaintiff's video purchases and/or rentals to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive advertisers, non-profit organizations, and other third-party companies. As a result, Plaintiff has received a barrage of unwanted junk mail. Moreover, by selling, renting, exchanging, and/or otherwise disclosing Plaintiff's Personal Viewing Information (defined below at ¶ 7), TLA violated Plaintiff's privacy rights under the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA"), as well as the New York Video Consumer Privacy Act, N.Y. Gen. Bus. Laws ("GBL") § 670, *et seq.* (the "NYVCPA").

2.      Documentary evidence confirms these allegations.  For example, a list broker, NextMark, offers to provide renters access to the Personal Viewing Information of 116,236 "GAY BUYERS" of TLA pornographic videos (as of August 1, 2017), at a base price of "$125.00/M [per thousand]," (*i.e.*, 12.5 cents apiece), as shown in the following screenshot of a data card from NextMark's website:

9/19/2019                               TLA VIDEO CATALOG GAY BUYERS Mailing List



# TLA VIDEO CATALOG GAY BUYERS Mailing List

TLA is one of the nation's leading direct marketers of gay and lesbian cinema, including documentaries, short and features length films, and a large selection of independent and foreign films.

[ Get Count ] [ Get Pricing ] [ Get More Information ]

| SEGMENTS | COUNTS THROUGH 08/01/2017 | |
|---|---|---|
| 116,236 TOTAL UNIVERSE / BASE RATE | $125.00/M | |
| 4,752 3 MONTH BUYERS | $125.00/M | |
| 8,368 6 MONTH BUYERS | $125.00/M | |
| 14,685 12 MONTH BUYERS | $125.00/M | |

**DESCRIPTION**

TLA is one of the nation's leading direct marketers of gay and lesbian cinema, including documentaries, short and features length films, and a large selection of independent and foreign films.

TLA's customers are average income of $50K+ and average age of 34.  They are very upscale and loyal and appreciate the wide selection of the latest and hard-to-find gay theme/interest videos through mail order.  The catalog mails quarterly.

GLBT Purchasing Behavior:
Over $485 billion in buying power
$27,300 buying power per capita
87% Have made an in-store purchase in the last 30 days - as a result of a direct mail campaign
23% Have volunteered for charity work
80% More likely to have an AMEX Gold Card

| POPULARITY: | ===== 96 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | 📧 |
| SOURCE: | DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |
| GENDER: | 100% MALE |
| SPENDING: | $69.00 AVERAGE ORDER |

| SELECTS | |
|---|---|
| STATE/SCF/ZIP | $10.00/M |
| ZIP + 4 | $10.00/M |
| ZIP FILE | $10.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $4.00/M |
| EMAIL | $50.00/F |
| P/S LABELS | $8.00/M |
| RUN CHARGES | $8.00/M |
| ZIP FILE | $10.00/M |

**RELATED LISTS**
- OUT MAGAZINE
- THE ADVOCATE
- THE GAY & LESBIAN REVIEW
- OUT/ADVOCATE GAY MASTERFILE
- NATIONAL LGBTQ TASK FORCE
- ADAM MALE
- EXTREME - GAY & LESBIAN MASTERFILE
- JOCKO EVERYWEAR - URBAN GAY BUYERS
- FUTURE MARKETING - GAY & LESBIAN MASTER FILE
- GAY, LESBIAN & BISEXUAL TRAVEL ENTHUSIASTS

*See* Complaint **Exhibit A** hereto.

3.      TLA, through NextMark, also offers to provide renters access to the Personal Viewing Information of 135,107 "STRAIGHT BUYERS" of TLA pornographic videos (as of

2

August 1, 2017), at the same base price of "$125.00/M [per thousand]," (*i.e.*, 12.5 cents apiece), as shown in the following screenshot of another data card from NextMark's website:



*See* Complaint **Exhibit B** hereto.

4.      By selling, renting, exchanging, or otherwise disclosing the Personal Viewing Information of its video consumers, TLA violated the VPPA.  Subsection (b)(1) of the VPPA provides:

> A video tape service provider who knowingly discloses, to any
> person, personally identifiable information concerning any
> consumer of such provider shall be liable to the aggrieved person.

18 U.S.C. § 2710(b)(1).  The VPPA authorizes "[a]ny person aggrieved by any act of person in violation of" it to "bring a civil action in a United States district court," to recover "actual damages but not less than liquidated damages in an amount of $2,500" as well as "punitive damages" and "reasonable attorneys' fees and other litigation costs reasonably incurred."  18 U.S.C. § 2710 (c)(1)-(2).

5.      By selling, renting, exchanging, or otherwise disclosing the Personal Viewing Information of its New York-based video consumers, TLA also violated the NYVCPA.  The NYVCPA provides:

> A video tape service provider who knowingly discloses, to any
> person, personally identifiable information concerning any
> consumer of such provide shall be liable to the aggrieved person.

GBL § 673(1).  The NYVCPA also provides that "[a]ny person found to be in violation of [it] shall be liable to the aggrieved consumer for all actual damages sustained by such consumer as a result of the violation, provided that the consumer who prevails or substantially prevails in an action brought under this section shall receive not less than five hundred dollars in damages, regardless of the amount of actual damages proved, plus costs, disbursements and reasonable attorneys' fees."  GBL § 675(1).

6.      Accordingly, Plaintiff brings this Class Action Complaint against TLA for its intentional and unlawful disclosure of its consumers' Personal Viewing Information in violation of the VPPA and the NYVCPA.

## NATURE OF THE CASE

7.      To supplement its revenues, TLA sells, rents, exchanges, or otherwise discloses its consumers' personal information—including their names and addresses, as well as the genre

4

and titles of videos purchased and/or rented from TLA (collectively "Personal Viewing Information"), as well as their sexual orientation—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its consumers.

8.      TLA's disclosure of Personal Viewing Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society, including members of the LGBTQ community.  In fact, almost any organization could rent a list with the names and addresses of all gay TLA consumers who live in Texas; such a list would cost approximately $135.00 per thousand names listed.

9.      While TLA profits handsomely from the unauthorized sale, rental, exchange, and/or disclosure of its consumers' Personal Viewing Information and other personal information, it does so at the expense of its consumers' privacy and statutory rights because TLA does not obtain its consumers' written consent prior to disclosing their Personal Viewing Information.

**PARTIES**

10.      Plaintiff Dennis Chiamulera is a natural person and citizen of New Windsor, New York.  Plaintiff Chiamulera is a consumer of TLA videos.  While residing in, a citizen of, and present in New York, Plaintiff Chiamulera purchased and/or rented videos from TLA.  Prior to and at the time he purchased and/or rented TLA, TLA did not notify Plaintiff Chiamulera that it discloses the Personal Viewing Information of its consumers, and Plaintiff Chiamulera has never authorized TLA to do so.  Furthermore, Plaintiff Chiamulera was never provided any written notice that TLA sells, rents, exchanges, or otherwise discloses its consumers' Personal Viewing Information, or any means of opting out.  Since becoming a TLA video consumer, TLA disclosed, without consent or prior notice, Plaintiff Chiamulera's Personal Viewing Information

5

to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, TLA sold, rented, or exchanged mailing lists containing Plaintiff Chiamulera's Personal Viewing Information to third parties seeking to contact TLA consumers, without first obtaining Plaintiff Chiamulera's written consent or even giving him prior notice of the sales, rentals, exchanges, and/or other disclosures.  Because TLA sold, rented, exchanged, and/or otherwise disclosed his Personal Viewing Information, Plaintiff Chiamulera now receives junk mail from various organizations that do not offer products or services to consumers.  These unwarranted mailings waste Plaintiff Chiamulera's time, money, and resources.  These harassing junk mailings received by Plaintiff Chiamulera are attributable to TLA's unauthorized sale, rental, exchange, and/or disclosure of his Personal Viewing Information.  Because Plaintiff Chiamulera is entitled by law to privacy in his Personal Viewing Information, and because he paid money for TLA videos, TLA's disclosure of his Personal Viewing Information deprived Plaintiff Chiamulera of the full set of benefits to which he was entitled as a TLA consumer, thereby causing him economic harm.  Accordingly, what Plaintiff Chiamulera received (TLA videos without statutory privacy protections) was less valuable than what he paid for (TLA videos with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his TLA videos had he known that TLA would disclose his Personal Viewing Information.  Plaintiff Chiamulera did not discover that TLA sold, rented, exchanged, and/or otherwise disclosed his Personal Viewing Information until September 2019.

11.    Defendant TLA Entertainment Group, Inc. is a Pennsylvania corporation with its principal place of business at 631 N. 6th Street, Philadelphia, PA 19123.  TLA is one of the nation's leading providers of adult films and specializes in gay and lesbian cinema.  TLA does

6

business throughout New York and the entire United States.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from each of the Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves violations of a federal statute, the VPPA.

14.     The Court has personal jurisdiction over Defendant because Defendant conducts substantial business within New York, such that Defendant has significant, continuous, and pervasive contacts within the State of New York.

15.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *The Video Privacy Protection Act*

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     Recognizing the need to further protect privacy rights, Congress enacted the

7

VPPA.

18.    Subsection (b)(1) of the VPPA provides:

> A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person.

18 U.S.C. § 2710(b)(1).

19.    The VPPA recognizes the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

20.    As Senator Patrick Leahy recognized, "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

21.    Senator Leahy also explained why choices in movies are so private: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

22.    Despite that thousands of Americans purchase and/or rent TLA videos, TLA disregarded its legal responsibility by systematically violating the VPPA.

### The New York Video Consumer Privacy Act

23.    In 1993, a few years after Congress enacted the VPPA, the New York Legislature took action of its own to protect the video privacy of New Yorkers and enacted the

NYVCPA.

24.     As the New York Legislature stated:

> The legislature finds and declares that the viewing of rented video tapes and movies in the home is a popular and widespread leisure pastime.  Innumerable retail establishments in this state commonly record, often by computer, data containing the identities of consumers who have rented video tapes and movies and the titles of the videos rented.  The large amounts of personally identifiable information collected by such establishments, and the possibility of public dissemination of that information, pose a serious threat to the personal privacy of New Yorkers and is therefore a matter of state concern.

GBL § 671.

25.     Despite the fact that thousands of New Yorkers purchase and/or rent TLA videos, TLA disregarded its legal responsibility by systematically violating the NYVCPA.

### *The Personal Information Market:  Consumers' Personal Information Has Real Value*

26.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

27.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

---

[1] The Information Marketplace:  Merging and Exchanging Consumer Data  (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Jan. 29, 2019).

[2] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited Jan. 29, 2019).

28.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

29.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

30.     The scope of data aggregators' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

31.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

---

[3] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Jan. 29, 2019) (emphasis added).

[4] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Jan. 29, 2019).

[5] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Jan. 29, 2019).

[6] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012)

32.     Recognizing the serious threat the data mining industry poses to consumers'
privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus
sent a letter to nine major data brokerage companies seeking information on how those
companies collect, store, and sell their massive collections of consumer data.[7]

33.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data
> brokers have developed hidden dossiers on every U.S. consumer.
> This large[-]scale aggregation of the personal information of
> hundreds of millions of American citizens raises a number of
> serious privacy concerns.[8]

34.     Data aggregation is especially troublesome when consumer information is sold
to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail
advertisers often use consumer information to lure unsuspecting consumers into various scams,[9]
including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like TLA
share information with data aggregators, data cooperatives, and direct-mail advertisers, they
contribute to the "[v]ast databases of names and personal information" that are often "sold to
thieves by large publicly traded companies," which "put[s] almost anyone within the reach of

---

*available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Jan. 29, 2019).

[7] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Jan. 29, 2019).

[8] *Id.*

[9] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Jan. 29, 2019).

fraudulent telemarketers" and other criminals.[10]

35.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like TLA's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[11]

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

37.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[12]  As a result, 81 percent of smartphone users polled

---

[10] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Jan. 29, 2019).

[11] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Jan. 29, 2019).

[12] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Jan. 29, 2019).

said that they avoid using smartphone apps that they don't believe protect their privacy online.[13]

39.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

40.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[14]

41.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[15]

42.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[16]  As such, while a

-----

[13] *Id.*

[14] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Jan. 29, 2019).

[15] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jan. 29, 2019).

[16] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *TLA Unlawfully Sells, Rents, Exchanges, And Discloses Its Consumers' Personal Viewing Information*

43.     TLA maintains a vast digital database comprised of its consumers' Personal Viewing Information.  TLA discloses its consumers' Personal Viewing Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each TLA consumer.  (*See, e.g.*, **Exhibits A-B**).

44.     TLA then sells, rents, and/or exchanges its mailing lists—which include consumers' Personal Viewing Information identifying which individuals purchased which video genres and titles, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, marketing companies, and organizations soliciting donations or raising awareness about various social and political issues (*See id.*).

45.     TLA also discloses its consumers' Personal Viewing Information to data cooperatives, who in turn, give TLA access to their own mailing list databases.

46.     As a result of TLA's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from TLA that identify TLA consumers by their most intimate details, including sexual orientation.  TLA's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, TLA will rent—to almost any organization willing to pay for it—a list with the names and addresses of all men who are gay, reside in Texas, and have purchased and/or rented TLA adult videos; such a list would cost approximately $135.00

per thousand names listed.

47.     TLA does not seek its consumers' prior written consent to any of these

disclosures and its consumers remain unaware that their Personal Viewing Information and other

sensitive personal information is being rented and exchanged on the open market.

48.     TLA uniformly fails to obtain any form of consent from – or even provide

effective notice to – its consumers before disclosing their Personal Viewing Information.

49.     As a result, TLA disclosed its consumers' Personal Viewing Information –

including their sexual orientation and adult film preferences that can "reveal intimate facts about

our lives, from our political and religious beliefs to our health concerns"[17] – to anybody willing

to pay for it.

50.     By and through these actions, TLA has intentionally disclosed to third parties its

consumers' Personal Viewing Information without consent, in direct violation of the VPPA and

the NYVCPA.

51.     On September 20, 2019, prior to filing this lawsuit, Plaintiff's Counsel sent a

letter via FedEx to Defendant informing it of these allegations and inviting Defendant to contact

Plaintiff's Counsel to confer about the same on or before October 4, 2019.  Although the letter

was successfully delivered on September 23, 2019, as of the date of this filing Defendant has not

contacted Plaintiff's Counsel.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff seeks to represent a class defined as all persons in the United States who

had their Personal Viewing Information disclosed to third parties by TLA without consent (the

---

[17] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Jan. 29, 2019).

"Class").  Excluded from the Class is any entity in which the Defendant has a controlling

interest, as well as all officers and directors of Defendant.

53.     Plaintiff also seeks to represent a subclass of all Class members who reside in

New York (the "New York Subclass").

54.     Members of the Class and New York Subclass are so numerous that their

individual joinder herein is impracticable.  On information and belief, members of the Class and

New York Subclass number in the thousands.  The precise number of Class and New York

Subclass members and their identities are unknown to Plaintiff at this time but may be

determined through discovery.  Class and New York Subclass members may be notified of the

pendency of this action by mail and/or publication through the distribution records of Defendant.

55.     Common questions of law and fact exist as to all Class and New York Subclass

members and predominate over questions affecting only individual Class and New York

Subclass members.  Common legal and factual questions include, but are not limited to:  (a)

whether TLA is a "video tape service provider;" (b) whether TLA obtained consent before

disclosing to third parties Plaintiff's and the Class's Personal Viewing Information; and (c)

whether TLA's disclosures of Plaintiff's and the Class's Personal Viewing Information violated

the VPPA and/or NYVCPA.

56.     The claims of the named Plaintiff are typical of the claims of the Class and New

York Subclass in that the named Plaintiff and the Class and New York Subclass sustained

damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's

disclosure of Plaintiff's and the Class's and New York Subclass's Personal Viewing Information.

57.     Plaintiff is an adequate representative of the Class and New York Subclass

because his interests do not conflict with the interests of the Class and New York Subclass

members he seeks to represent, he has retained competent counsel experienced in prosecuting

class actions, and he intends to prosecute this action vigorously.  The interests of Class and New

York Subclass members will be fairly and adequately protected by Plaintiff and his counsel.

58.     The class mechanism is superior to other available means for the fair and efficient

adjudication of the claims of Class and New York Subclass members.  Each individual Class

member and New York Subclass member may lack the resources to undergo the burden and

expense of individual prosecution of the complex and extensive litigation necessary to establish

Defendant's liability.  Individualized litigation increases the delay and expense to all parties and

multiplies the burden on the judicial system presented by the complex legal and factual issues of

this case.  Individualized litigation also presents a potential for inconsistent or contradictory

judgments.  In contrast, the class action device presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision

by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will

ensure that all claims and claimants are before this Court for consistent adjudication of the

liability issues.

## COUNT I
### Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710

59.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

set forth herein.

60.     Plaintiff brings this claim individually and on behalf of members of the Class

against TLA.

61.     TLA is a video tape service provider pursuant to 18 U.S.C. § 2710(a)(4) of the

VPPA.  TLA is "engaged in the business, in or affecting interstate or foreign commerce, of

rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" by

17

streaming videos to consumers through its website for purchase and/or rental.  TLA also offers home delivery of videos to consumers for purchase.

62.     As persons who have purchased and/or rented videos from TLA, Plaintiff and members of the Class are consumers within the definition of 18 U.S.C. § 2710(a)(1) of the VPPA.

63.     The collection of consumers' Personal Viewing Information – including names, addresses, and video genres and titles purchased and/or rented – constitutes the collection of personally identifiable information ("PII") within the meaning of 18 U.S.C. § 2710(a)(3), because it "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

64.     TLA disclosed Plaintiff's Personal Viewing Information, which identified him as a TLA video consumer, in at least three ways.

65.     First, TLA disclosed mailing lists containing Plaintiff's Personal Viewing Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to TLA.

66.     Second, TLA disclosed mailing lists containing Plaintiff's Personal Viewing Information to data cooperatives, who in turn gave TLA access to their own mailing list databases.

67.     Third, TLA sold, rented, and/or exchanged its mailing lists containing Plaintiff's Personal Viewing Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions or raising awareness about various social and

political issues, and volunteer work .

68.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and TLA was able to increase its profits gained from the mailing list rentals and/or exchanges.

69.     By selling, renting, exchanging, or otherwise disclosing its consumer lists, TLA disclosed to persons other than Plaintiff, personally identifiable information concerning its consumers.  *See* 18 U.S.C § 2710(b)(1).

70.     The information TLA disclosed indicates Plaintiff's name and address, as well as the genres and titles of videos he purchased and/or rented from TLA.  Accordingly, the records or information disclosed by TLA constitute personally identifiable information.  *See* 18 U.S.C. § 2710(a)(3).

71.     Plaintiff and the members of the Class never consented to TLA disclosing their Personal Viewing Information to anyone.

72.     Indeed, TLA failed to solicit and/or obtain consent from Plaintiff and the Class members to collect and disclose their PII, nor did TLA provide clear and conspicuous notice of the disclosure of PII, as defined in 18 U.S.C. § 2710(b)(2)(B).

73.     Worse yet, Plaintiff and the members of the Class did not even receive notice before TLA disclosed their Personal Viewing Information to third parties.

74.     TLA's disclosures were not made in the ordinary course of business as defined by 18 U.S.C. § 2710(a)(2), because they were not "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership."

75.     By knowingly disclosing Plaintiff's Personal Viewing Information, TLA violated Plaintiff's and Class Members' statutorily-protected right to privacy in their viewing habits.  *See*

18 U.S.C. § 2710(b)(1).

76.     Additionally, because Plaintiff and the members of the Class paid for their TLA video purchases and/or rentals, and TLA was obligated to comply with the VPPA, TLA's unlawful disclosure of Plaintiff's and the other Class members' Personal Viewing Information deprived Plaintiff and the Class members of the full value of their paid-for video purchases and/or rentals.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Viewing Information, TLA's unlawful sale, rental, exchange, and/or other disclosure of their Personal Viewing Information caused them to receive less value than they paid for, thereby causing them economic harm.

77.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Viewing Information, a video service provider that keeps their Personal Viewing Information private is more valuable than one that does not.

78.     Accordingly, had Plaintiff been adequately informed of TLA's disclosure practices, he would not have been willing to purchase and/or rent TLA videos at the price charged, if at all.  Thus, TLA's unlawful disclosures caused Plaintiff economic harm.

79.     TLA's disclosure of Plaintiff's Personal Viewing Information to third parties has also caused an influx of third-party print advertisements.

80.     As a result of TLA's unlawful disclosure of their Personal Viewing Information, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of himself and the Class, Plaintiff seeks:  (1) actual damages, but not less than liquidated damages in an amount of $2,500 per Class member pursuant to 18 U.S.C. § 2710(c)(2)(A); (2) punitive damages pursuant to 18 U.S.C. § 2710(c)(2)(B); (3) reasonable attorneys' fees and other litigation costs reasonably incurred pursuant to 18 U.S.C. § 2710(c)(2)(C); and (4) such other

preliminary and equitable relief as the court determines to be appropriate pursuant to 18 U.S.C. § 2710(c)(2)(D).

## COUNT II
### Violation of the New York Video Consumer Privacy Act ("NYVCPA"), GBL §§ 670-675

81.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

82.     Plaintiff brings this claim individually and on behalf of members of the New York Subclass against TLA.

83.     TLA is a video tape service provider pursuant to GBL § 672(4) of the NYVCPA. TLA is "engaged in the business of rental of prerecorded video cassette tapes or similar audio visual materials" by streaming videos to consumers through its website for rental.  TLA also offers home delivery of videos to consumers rental.

84.     TLA is also a video tape seller pursuant to GBL § 672(5) of the NYVCPA.  TLA is "engaged in the business of selling of prerecorded video cassette tapes or similar audio visual materials" by streaming videos to consumers through its website for purchase.  TLA also offers home delivery of videos to consumers for purchase.

85.     As persons who have purchased and/or rented videos from TLA, Plaintiff and members of the New York Subclass are consumers within the definition of GBL § 672(1) of the NYVCPA.

86.     The collection of consumers' Personal Viewing Information – including names, addresses, and genres and titles of videos purchased and/or rented – constitutes the collection of personally identifiable information ("PII") within the meaning of GBL § 672(3), because it includes "information which identifies a person as having requested or obtained specific video

materials or services from a video tape service provider or video tape seller."

87.     TLA disclosed Plaintiff' Personal Viewing Information, which identified him as a TLA video consumer, in at least three ways.

88.     First, TLA disclosed mailing lists containing Plaintiff's Personal Viewing Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to TLA.

89.     Second, TLA disclosed mailing lists containing Plaintiff's Personal Viewing Information to data cooperatives, who in turn gave TLA access to their own mailing list databases.

90.     Third, TLA sold, rented, and/or exchanged its mailing lists containing Plaintiff's Personal Viewing Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions or raising awareness about various social and political issues, and volunteer work.

91.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and TLA was able to increase its profits gained from the mailing list rentals and/or exchanges.

92.     By selling, renting, exchanging, or otherwise disclosing its consumer lists, TLA disclosed to persons other than Plaintiff, personally identifiable information concerning its consumers.  *See* GBL § 673(1); GBL § 674(1).

93.     The information TLA disclosed indicates Plaintiff's name and address, as well as the genres and titles of videos he purchased and/or rented from TLA.  Accordingly, the records

or information disclosed by TLA constitute personally identifiable information.  *See* GBL § 672(3).

94.     Plaintiff and the members of the New York Subclass never consented to TLA disclosing their Personal Viewing Information to anyone.

95.     Indeed, TLA failed to solicit and/or obtain consent from Plaintiff and the New York Subclass members to collect and disclose their PII, nor did TLA provide clear and conspicuous notice of the disclosure of PII, as defined in GBL § 672(6).

96.     Worse yet, Plaintiff and the members of the New York Subclass did not even receive notice before TLA disclosed their Personal Viewing Information to third parties.

97.     Moreover, Plaintiff and the members of the New York Subclass did not provide "informed, written consent," as defined in GBL § 672(6).

98.     TLA's disclosures were not made in the ordinary course of business as defined by GBL § 672(2) because they were not "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership."

99.     TLA's disclosures were not:  (1) made to a grand jury pursuant to a grand jury subpoena; (2) made pursuant to a court order in a civil or criminal proceeding; (3) made to a law enforcement agency pursuant to a warrant lawfully obtained under the laws of New York or the United States; or (4) made to a court pursuant to a civil action for conversion commenced by TLA or to enforce collection for unpaid video tapes.  *See* GBL § 673(2); GBL § 674(2).

100.     TLA's disclosures of Plaintiff's and the New York Subclass's Personal Viewing Information were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions or raising awareness about various social and political issues, volunteer work, and votes – all in order to increase TLA's

revenue.  Accordingly, TLA's disclosures were not made for the exclusive use of marketing goods and services directly to the consumer.  *See* GBL § 674(3)(b)(ii)(2).

101.    By knowingly disclosing Plaintiff's Personal Viewing Information, TLA violated Plaintiff's and New York Subclass Members' statutorily-protected right to privacy in their viewing habits.  *See* GBL § 673(1); GBL § 674(1).

102.    Additionally, because Plaintiff and the members of the New York Subclass paid for their TLA video purchases and/or rentals, and TLA was obligated to comply with the VPPA, TLA's unlawful disclosure of Plaintiff's and the other New York Subclass members' Personal Viewing Information deprived Plaintiff and the New York Subclass members of the full value of their paid-for video purchases and/or rentals.  Because Plaintiff and the other New York Subclass members ascribe monetary value to the privacy of their Personal Viewing Information, TLA's unlawful sale, rental, exchange, and/or other disclosure of their Personal Viewing Information caused them to receive less value than they paid for, thereby causing them economic harm.

103.    Likewise, because Plaintiff and the other New York Subclass members ascribe monetary value to the privacy of their Personal Viewing Information, a video service provider or video tape seller that keeps their Personal Viewing Information private is more valuable than one that does not.

104.    Accordingly, had Plaintiff been adequately informed of TLA's disclosure practices, he would not have been willing to purchase and/or rent TLA videos at the price charged, if at all.  Thus, TLA's unlawful disclosures caused Plaintiff economic harm.

105.    TLA's disclosure of Plaintiff's Personal Viewing Information to third parties has also caused an influx of third-party print advertisements.

106.    As a result of TLA's unlawful disclosure of their Personal Viewing Information,

Plaintiff and the members of the New York Subclass have suffered privacy and economic injuries.  On behalf of himself and the New York Subclass, Plaintiff seeks:  (1) actual damages, but not less than $500 per New York Subclass member, regardless of the amount of actual damage proved, pursuant to GBL § 675(1); and (2) costs, disbursements and reasonable attorneys' fees pursuant to GBL § 675(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek a judgment against Defendant as follows:

A. For an order certifying the Class and New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order declaring that Defendant's conduct as described herein violates the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710;

C. For an order declaring that Defendant's conduct as described herein violates the New York Video Consumer Privacy Act ("NYVCPA"), GBL §§ 670-675;

D. For an order finding in favor of Plaintiff and the Class and New York Subclass on all counts asserted herein;

E. For an award of actual damages or $2,500, whichever is greater, to Plaintiff and each Class member, as provided by the VPPA;

F. For an award of actual damages or $500, whichever is greater, to Plaintiff and each New York Subclass member, as provided by the NYVCPA.

G. For prejudgment interest on all amounts awarded;

H. For an order of restitution and all other forms of equitable monetary relief;

I. For an order awarding Plaintiff and the Class their reasonable

25

attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  October 15, 2019

Respectfully submitted,

By: _____ */s Philip L. Fraietta* _____
        Philip L. Fraietta

Joseph I. Marchese
jmarchese@bursor.com
Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

*Attorneys for Plaintiff Dennis Chiamulera*